UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IRINA ULYANENKO, :
:
         Plaintiff, :
: **MEMORANDUM and ORDER**
    -against- :
: 09 Civ. 3513 (LAK)(KNF)
METROPOLITAN LIFE INSURANCE COMPANY :
and LIFE INSURANCE COMPANY OF NORTH :
AMERICA, :
         Defendants. :
------------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## INTRODUCTION

The plaintiff brings this action, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., to recover benefits from the Life Insurance Company of North America ("LINA"), the administrator of her deceased daughter's accidental death policy. Before the Court is the plaintiff's motion, pursuant to Fed. R. Civ. P. 37, to strike the defendant's answer and enter judgement, by default.

## BACKGROUND

On March 2, 2009, the plaintiff initiated this action against the Metropolitan Life Insurance Company ("MetLife") and CIGNA Life Insurance Company of New York ("CIGNA") in the New York State Supreme Court, New York County. On April 7, 2009, CIGNA removed the action to this court. On April 30, 2009, the court substituted defendant CIGNA with LINA and, on October 8, 2009, the court dismissed the action against MetLife, leaving LINA the sole defendant.

On May 7, 2009, the assigned district judge, the Honorable Lewis A. Kaplan, put in place a case management plan, wherein he directed the parties to complete all discovery on or before September 9, 2009. Judge Kaplan later extended the discovery completion deadline to January 15, 2010.

On July 13, 2009, the plaintiff served LINA with her first request for documents, seeking production of LINA's administrative file "including all rules and regulations, contracts, policies, [and] correspondences[] regarding the insurance policy for [the] decedent[.]" On August 5, 2009, LINA served its response to the plaintiff's first request for documents, claiming all responsive documents were produced previously, on May 27, 2009, with LINA's initial disclosures.

On October 9, 2009, the plaintiff served LINA with a notice of deposition, to which she appended a request for documents, which resembled her first request for documents. Specifically, the plaintiff sought from LINA: (1) all documents involving the decedent; and (2) all rules, regulations, policies and directives for "the determination of administering benefits[.]" On October 19, 2009, LINA objected to the deposition, claiming it was noticed improperly and, in any event, such discovery was improper, absent a showing of good cause.[1] More than three months later, on February 4, 2010, the plaintiff filed a motion to compel LINA's deposition. On February 9, 2010, Judge Kaplan granted the plaintiff's motion, finding that she had established good cause.

On March 3, 2010, as the deposition approached, the plaintiff supplemented, via an e-mail message, her request for production from LINA, by requesting several broad categories of documents. The plaintiff, in essence, requested: (1) all records pertaining to LINA claims processing generally and, in particular, claims involving gender, pregnancy, clots, embolisms,

---

[1] While the presumption in an ERISA action is "that judicial review 'is limited to the record in front of the claims administrator,'" a district court may find good cause to consider additional evidence. Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir. 2003) (quoting DeFelice v. Am. Int'l Life Assurance Co. of N.Y., 112 F.3d 61, 66 [2d Cir. 1997]). "The decision whether to consider evidence from outside the administrative record is within the discretion of the district court." Muller, 341 F.3d at 125. "Consistent with the recognition that evidence outside the record is sometimes relevant even on 'arbitrary and capricious' review, cases in this circuit have allowed discovery of evidence outside of the administrative record on issues such as the 'parameters' of the administrative record, whether the administrator of the plan had a conflict of interest, and other issues relating to procedures used for adjudication by the plan administrator." Mitchell v. First Reliance Standard Life Ins. Co., 237 F.R.D. 50, 53 (S.D.N.Y. 2006).

thromboembolism, genetics and genetic predispositions; (2) data on the number of claims, in the past 10 years, involving clots, embolisms, thromboembolism, genetics, genetic predispositions, oral contraceptives, women and men, which were (a) initially denied, and (b) ultimately paid; and (3) all records relating to LINA's evaluation and promotion criteria. LINA objected to these new requests, on the ground that they were outside the scope of the deposition notice. To resolve this, and other disputes pertaining to the deposition, Judge Kaplan held a telephonic conference with the parties on March 4, 2010. No record exists from that conference, leaving the Court unable to determine what, if anything, Judge Kaplan ordered with respect to document production.[2]

On March 9, 2010, the plaintiff deposed Sandra S. Smith ("Smith"), a LINA accident specialist who initially denied the plaintiff's claim for benefits. The deposition occurred in Pittsburgh, Pennsylvania, and LINA paid, voluntarily, the travel and accommodation expenses for the plaintiff's counsel. During Smith's deposition, the plaintiff's counsel requested the following additional documents be produced: (1) transcripts of Smith's two prior depositions and the pleadings in those cases; (2) the annual performance goals LINA uses to evaluate accident specialists ; (3) the training manual for accident specialists; and (4) the accidental death policy in place prior to that in effect when the plaintiff's daughter died.

On July 20, 2010, Judge Kaplan held a hearing with the parties, and ordered LINA to produce: (1) "all of the documents that were requested by the plaintiff up to the time of the March 4 telephone conference"; (2) "all of the documents that were requested during the Smith deposition"; (3) "the original claim file or an affidavit by a person with personal knowledge stating that she has compared the original claim file with the copy that was produced earlier to the plaintiff and that the copy that was produced is a complete, true, and accurate copy of the original and all of its parts"; and

---

[2] The parties dispute the outcome of the March 4, 2010 telephonic conference. LINA contends that it "did not agree to produce anything outside the scope of the production requests attached to the deposition notice." According to the plaintiff, LINA agreed to produce records responsive to all document demands made by the plaintiff until that date.

(4) Rene Worst ("Worst") for a deposition in New York, on an date agreeable to the parties. During the conference, Judge Kaplan noted that LINA had delayed this action for at least four months and caused the plaintiff's counsel to go to Pittsburgh for "no good reason" to depose Smith, who was not the individual who ultimately denied the plaintiff's claim. Judge Kaplan denied the plaintiff's motion for sanctions "with respect to what has gone on up until now," without prejudice to renewal "if there is any future problem in this case." Thereafter, in an order, dated July 30, 2010, Judge Kaplan denied LINA's letter motion, requesting entry of a protective order, noting that LINA "has been engaged in obstruction of discovery in this action for some time."

On August 4, 2010, LINA served the plaintiff with its Responses to Plaintiff's Discovery Demands Pursuant to July 20, 2010 Court Order ("August 4 Responses"). In its August 4 Responses, LINA provided the plaintiff data concerning the number of claims made, initially denied and ultimately paid involving men and women. Along with the August 4 Responses, LINA produced: (1) "the complete version of its policies & procedures manual that was in effect during the relevant time period to the best of its ability"; (2) a copy of the "SRO Manual in effect at the time of the plaintiff's claim"; (3) a transcript of a prior deposition of Smith and pleadings from the corresponding case; and (4) Smith's annual performance goals.

Moreover, LINA provided the plaintiff with affidavits from Brian Billeter ("Billeter") and Michael James ("James"). Billeter, LINA's regional claims manager for accident claims, attests to having personal knowledge of LINA's computer systems for accidental death and dismemberment claims ("AD&D claims") and LINA's storage and retention policies and procedures for AD&D claims. According to Billeter, "[w]hen an AD&D claim is received by LINA, it is entered into the electronic system and coded based on certain general identification information about the claimant and the coverage at issue." As a result, Billeter represents that "[t]here are no electronic codes utilized by LINA in connection with [AD&D claims] which would allow LINA to run electronic reports or . . . identify claims related to clots/embolisms/thromboembolisms, genetics/genetic

4

Case 1:09-cv-03513-JPO-KNF   Document 56   Filed 06/03/11   Page 5 of 13

predisposition, and/or oral contraceptives." Billeter states that the only way to obtain such information would be to conduct a manual search of more than 25,000 AD&D claims reviewed by LINA in the last ten years, which he estimates could take years to complete. Morever, Billeter states that LINA: (1) does not have any documents relating to the criteria for awarding bonuses, raises, and/or promotions; and (2) has not been fined by any state attorney general between 2005 and 2007, for reasons related to AD&D claims.

James, a LINA operations representative for life and accident claims, attests to comparing the plaintiff's original claim file with the copy that was produced earlier to the plaintiff and that the copy is a complete, true and accurate reproduction of the original and all of its parts. James states further that no prior version of the policy at issue in this action existed.

On September 2, 2010, the plaintiff deposed Worst, the LINA appeals specialist who ultimately denied the plaintiff's claim. Worst testified that she had been deposed in four or five other cases arising from LINA's denial of benefits. The plaintiff's counsel requested production of the transcripts of those depositions and the pleadings from the cases.

On October 5, 2010, the plaintiff filed the instant motion to strike the answer, on the ground that LINA has violated four court orders to-date – specifically, those of February 9, March 4, July 20, and July 30, 2010. The plaintiff claims that the following documents still have not been produced by LINA: (1) its guidelines or manual for handling claim-denial appeals; (2) data regarding the numbers of claims made, denied and ultimately paid in cases involving clots/embolisms/thromboembolisms; (3) data regarding fines issued to LINA by any governmental agency for improper claim denials; (4) "data regarding year by year financial and claims breakdowns, including the number of denials, for time periods requested"; and (5) pleadings and the deposition transcripts from the second case in which Smith testified. Additionally, the plaintiff claims LINA's August 4, 2010 production of the AD&D Instructors Guide (the "Guide") is incomplete, out-of-sequence and obscured by a "confidential" watermark.

5

**DISCUSSION**

Fed. R. Civ. P. 37 authorizes a district court to sanction a party for failure "to obey an order to provide or permit discovery," by, inter alia, striking the disobedient party's pleading, in whole or in part, or "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi). "Strong sanctions should be imposed only for serious violations of discovery orders. Severe sanctions are justified, however, when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable." Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991) (internal citations omitted). "In considering whether to impose the 'litigation-ending sanction' of a default judgment for discovery abuse, courts have considered the following factors: (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." Am. Cash Card Corp. v. AT&T Corp., 184 F.R.D. 521, 524 (S.D.N.Y. 1999), aff'd 210 F.3d 354 (2d Cir. 2000).

Before determining whether the sanction the plaintiff seeks is warranted, it is incumbent on the Court to determine what orders, if any, LINA has violated. See Daval Steel, 951 F.2d at 1363 ("Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order."). Of the four orders the plaintiff claims LINA has violated, the Court focuses only on Judge Kaplan's July 20 and July 30, 2010 orders. To the extent the plaintiff contends LINA violated Judge Kaplan's February 9, 2010 order by producing an improper Fed. R. Civ. P. 30(b)(6) witness, the Court finds that Judge Kaplan has already determined that LINA acted in bad faith in producing its witness, and sanctioned LINA by compelling it to appear for a second deposition, in New York, at its own expense. Moreover, the Court is unable to determine whether LINA violated a March 4, 2010 order, as the Court has not been provided a record of the parties' telephonic conference with Judge Kaplan

6

and, hence, cannot conclude what directives, if any, Judge Kaplan gave the parties.

The plaintiff contends that LINA's August 4, 2010 production, made in response to Judge Kaplan's July 20, 2010 order, is deficient in that: (1) certain documents have not been produced; and (2) the production of the Guide is "incomplete, out-of-sequence, and partially obscured." The Court will address the plaintiff's grievances in turn.

**1.    Allegedly Unproduced Documents**

**A.    LINA's Appeals Manual**

The plaintiff claims that LINA has failed to produce any guidelines or manuals that appeals specialists may use in handling claim-denial appeals. According to LINA, the plaintiff never requested an appeals manual and, in any event, it does not have any manuals or procedures designed exclusively for appeals specialists. LINA maintains that, since appeals are essentially de novo reviews of initial denials, both reviews are governed by the same guidelines, which have already been produced to the plaintiff. The plaintiff contends that LINA's representation is not credible.

In support of its unsworn contention that it does not have an appeals manual, LINA points to Worst's testimony that she never asked for or received any written training materials from LINA. However, Worst's testimony does not support the proposition that an appeals manual does not exist – only that she never received one. Although the plaintiff may not have specifically requested an appeals manual previously, the Court finds that such a request would fall within broad parameters of documents requested prior to March 4, 2010, which Judge Kaplan ordered LINA to produce.

Accordingly, within ten days of entry of this order, LINA must produce any guidelines or manuals that appeals specialists may use in handling claim-denial appeals, regardless of whether any such guidelines or manuals were used by Worst. In the alternative, LINA must produce an affidavit, by an individual with personal knowledge, stating how appeals specialists are trained, including what materials, if any, are used in the training process and what materials, if any, are available for reference by an appeals specialist, when reviewing a claim denial.

B.      **Data Regarding the Number of Claims Involving Clots/Embolisms/Thromboembolism**

The plaintiff contends that LINA has failed to provide her with certain statistical data requested previously. Billeter has represented to the Court, via affidavit, that the information sought by the plaintiff is not readily accessible, via an electronic search, and would require a manual search of more than 25,000 AD&D claims reviewed by LINA in the last ten years. Billeter estimates a manual search could take years to complete. The plaintiff's speculation that LINA has such information at its immediate disposal is not evidence that contradicts Billeter's affidavit, indicating otherwise. Absent such evidence, the Court will not require LINA to produce the data sought, on the ground that the burden of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C)(iii). Billeter's affidavit provides a sufficient response to the plaintiff's request for data concerning the number of claims initially denied, and ultimately paid, involving clots/embolisms/thromboembolism.

C.      **Data Regarding Fines Issued to LINA**

According to the plaintiff, she requested previously from LINA data regarding any fines issued to it, by any governmental agency, for improper claim denials. LINA claims that the plaintiff requested information about fines by state attorneys general only, which Billeter's affidavit addresses.

The plaintiff has put forth no evidence to demonstrate if, and when, her demand was made to LINA. As the Court cannot determine precisely what the plaintiff requested, it cannot find that LINA has failed to respond properly, in violation of Judge Kaplan's July 20, 2010 order.

D.      **Data Regarding Year-by-Year Financial and Claims Breakdowns**

The plaintiff has put forth no evidence to demonstrate if, and when, she demanded that LINA produce its annual financials and "claims breakdowns." Moreover, the Court has not been able to locate such a request, based on its thorough review of documents submitted in support of, and in opposition to, the instant motion. Although the plaintiff did request certain claims data for the past

ten years, the plaintiff did not specify that she sought the data on a year-by-year basis. Hence, LINA's responses to theses requests, where provided, are sufficient and comply with Judge Kaplan's July 20, 2010 order.

E.     **Deposition Transcripts for Smith and Corresponding Pleadings**

LINA has only produced one deposition transcript for Smith, and the corresponding pleadings, although Smith testified that she had been deposed twice in the past. In its memorandum of law in opposition to the instant motion, LINA contends that it "does not keep a log of depositions by [its] employees" and, hence, is unable to produce the transcript from Smith's second deposition and the corresponding pleadings. LINA does not explain what search it undertook to locate the transcripts and why it was able to locate one, but not the other.

Accordingly, within ten days of entry of this order, LINA must produce the second Smith deposition transcript and corresponding pleadings. If it is unable to locate the transcript and pleadings, LINA must produce an affidavit, by an individual with personal knowledge, explaining the nature of search it undertook to locate the transcript and pleadings and why it was able to locate one set, but not the other.

**2.     Production of Training Manual**

According to LINA, it has produced the following documents, as they are maintained in the ordinary course of its business: (1) the two-volume Guide; (2) LINA's Life, Accident & Specialty Polices and Procedures; (3) the SRO Manual; and (4) the SRO Job Aid – Life and Accident Claim Services. The plaintiff objects to the production of the Guide, claiming it is incomplete, out-of-sequence and partially obscured by a "confidential" watermark.

The plaintiff has provided the Court evidence that suggests the Guide has been produced without a complete table of contents and out-of-order. LINA's unsworn statements that the Guide was produced in proper order are not persuasive in the face of evidence to the contrary. To the extent LINA may be arguing that it produced the Guide as it is kept in the ordinary course of business, it has failed to

9

meet its burden of demonstrating so, under Fed. R. Civ. P. 34(b)(2)(E)(i).  See Pass & Seymour, Inc. v. Hubbell Inc., 255 F.R.D. 331, 334 (N.D.N.Y. 2008) ("To carry this burden, a party must do more than merely represent to the court and the requesting party that the documents have been produced as they are maintained.").

Moreover, while the watermark that LINA has placed on the documents it produced does not obscure the text of the documents completely, the placement of the watermark is improper, as Judge Kaplan explicitly denied LINA's request for a protective order in this action.  Although the placement of the watermark is improper and ineffectual, the Court cannot conclude its placement violates Judge Kaplan's July 30, 2010 order, as that order did not direct LINA to take any course of action.  See Daval Steel, 951 F.2d at 1363.

To remedy its August 4, 2010 production, within ten days of entry of this order, LINA must remove its "confidential" watermark from all documents produced to the plaintiff thus far and reproduce them without any watermark.  Additionally, it must produce, to the plaintiff, a complete copy of the Guide, in the correct order and with a complete table of contents.  Along with the Guide, LINA must provide an affidavit, by an individual with personal knowledge, certifying that the copy of the Guide being produced is a complete, true and accurate copy of the original and all its parts.  If LINA is unable to produce the complete Guide, in proper order, it must provide the plaintiff an affidavit from the record custodian(s) that the Guide was produced in the manner in which it is regularly kept.  The affidavit must include: (1) a general description of how documents are organized at LINA, in the ordinary course of its business; and (2) information concerning where the Guide was maintained and from where it originated.

Given the deficiencies in LINA's production, the Court concludes that LINA has failed to comply fully with Judge Kaplan's July 20, 2010 order.  Nevertheless, at this juncture, the Court finds that LINA's conduct does not warrant a severe litigation-ending sanction.  LINA did not disregard Judge Kaplan's July 20, 2010 order; rather, it endeavored to comply, although the Court has found its

compliance deficient in certain respects. LINA's August 4 Responses do not evince a wilful disregard for court orders. Moreover, the Court is convinced that lesser sanctions – namely, compelling the aforementioned production and awarding the plaintiff attorney's fees – would better serve the court's interests in deterring future misconduct and having cases decided on their merits than would striking LINA's answer and entering judgment, by default.

**3.    Attorney's Fees**

Fed. R. Civ. P. 37(b)(2)(C) authorizes a district court, in lieu of sanctions such as striking a pleading, to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." The Court discerns no justification for LINA's partial non-compliance, nor any circumstances that would render an award of attorney's fees unjust. Hence, an award of reasonable attorney's fees, to compensate the plaintiff's counsel for the time incurred in making the instant motion, is appropriate.

In assessing the reasonableness of attorney's fees, courts in this circuit calculate the "presumptively reasonable fee," which is the product of the "reasonable hourly rate" and the hours reasonably expended by counsel. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 183-84 (2d Cir. 2008). The "reasonable hourly rate" is the "rate a paying client would be willing to pay . . . ." Id. at 190 (noting "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively"). The rate is generally the prevailing rate charged in the district where the court sits. Id. at 183. However, "the burden is on the fee applicant to produce satisfactory evidence-in addition to the attorney's own affidavits-that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11, 104 S. Ct. 1541, 1547 n.11 (1984).

In calculating the reasonable number of hours expended, a court should exclude documented hours which are "excessive, redundant, or otherwise unnecessary." See Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939-40 (1983).  To exclude these hours, a "court has discretion simply to deduct a reasonable percentage of the number of hours claimed . . . ." Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (upholding 20% reduction in requested hours for "vagueness, inconsistencies, and other deficiencies in the billing records").  "In reviewing a fee application, [a] district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997) (finding no abuse of discretion in reducing hours requested by half where associate billed "excessive[ly]").

The plaintiff's counsel, Robert J. Genis ("Genis"), seeks remuneration at an hourly rate of $500 and claims he expended 13 hours researching and drafting the instant motion.  Genis is a senior partner at a small law firm, located in Bronx, New York.  He has been admitted to practice in the Southern District of New York since 1984 and "has taken over 100 jury verdicts."  Genis has not indicated his primary area of practice, his customary hourly rate or his prior experience litigating ERISA actions.  Although the plaintiff has provided information about past fee awards in ERISA actions in this district, she has not demonstrated that Genis is of comparable skill, experience and reputation with the attorneys who received those fee awards. See Sheehan v. Met. Life Ins. Co., 450 F. Supp. 2d 321, 327-28 (S.D.N.Y. 2006) (finding hourly rate of $425 to be reasonable for trial lawyer with 36 years' experience, which included handling "'numerous'" ERISA claims); Barnes v. Am. Int'l Life Assur. Co. of New York, No. 08 Civ. 06222, 2010 WL 1253742, at *3 (S.D.N.Y. Mar. 16, 2010) (finding hourly rate of $495 to be reasonable for lawyer with 29 years' experience, focusing on disability and ERISA litigation for 20 years).  In light of the scant evidence provided to the Court to justify the hourly rate sought, the Court cannot conclude that the plaintiff's counsel is

12

entitled to an hourly rate of $500, and finds a rate of $300 would be more appropriate. See McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, No. 99 Civ. 9054, 2002 WL 1974054, at *4 (S.D.N.Y. Aug. 27, 2002) (finding hourly rate of $325 to be reasonable for an attorney "specialized in ERISA litigation" for over 20 years), aff'd sub nom. McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91 (2d Cir. 2006) (per curiam). Moreover, the Court has determined to award Genis fees for only 8 hours, rather than 13, to account for the fact that, in support of the instant motion, Genis submitted an improper affirmation, totaling 26 pages in length and presenting countless legal arguments and facts of which he has no personal knowledge. The affirmation added no value to the plaintiff's motion and warrants a reduction of Genis' hours.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion to strike the defendant's answer and enter judgement, by default, is denied, without prejudice. However, the defendant must produce the documents described above and pay the plaintiff $2,400, the reasonable attorney's fees she incurred bringing the instant motion. This order resolves Docket Entry No. 48.

Dated: New York, New York
       June 3, 2011

SO ORDERED:

_/s/ Kevin Nathaniel Fox_
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE