```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
IRINA ULYANENKO,                                              :
                                   Plaintiff,                 :
                                                              :
          -against-                                           :     09 Civ. 3513 (JPO)
                                                              :
METROPOLITAN LIFE INSURANCE                                   :     MEMORANDUM AND
COMPANY and LIFE INSURANCE OF                                 :         ORDER
NORTH AMERICA,                                                :
                                                              :
                                   Defendants.                :
------------------------------------------------------------- X
```

J. PAUL OETKEN, District Judge:

Irena Ulyanenko ("Plaintiff") brings this action against Life Insurance Company of North America ("LINA"), contending that her claim—as beneficiary of the accident death insurance policy of her daughter, Nadia Ulyanenko—was improperly denied under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. Considering the entirety of the evidence, this Court finds that Plaintiff has not met her burden of proving that her daughter's death stemmed from an external accident, as mandated by Nadia's insurance policy. Therefore, Plaintiff's claim is not covered under Nadia's accidental death policy.

**I.     Background**

    **A.  Factual Background**

Nadia Ulyanenko was a Vice President at Lehman Brothers when she died, far too young at the age of 29, as the result of a pulmonary embolism. She fell ill in a subway station on June 23, 2005, and was found in a subway bathroom, complaining of shortness of breath. Nadia told the responders that she "fe[lt] sick," but "denie[d]" being in any pain. She also "projectile vomit[ed]" twice in front of the responders. It appears that Nadia's illness came on "after eating

a peach." Nadia was taken to St. Luke's-Roosevelt Hospital Center. While in the emergency room she suffered several seizures and subsequently from cardiac arrest. CPR was performed and her pulse returned, at which point she was taken to the hospital's intensive care unit. On June 26, 2005, having been without brainstem reflexes since the night before, she was pronounced clinically brain dead. Nadia died on July 10, 2005. (LINA 0129-132, 134, 139, 147, 151, 241.)

On July 12, 2005, Michael J. Greenberg, M.D., of the New York Office of the Chief Medical Examiner, performed an autopsy on the body. The autopsy report of Dr. Greenberg, dated August 4, 2005, indicates that Nadia died of a pulmonary embolism. The causes of Nadia's death, according to Dr. Greenberg, were the genetic mutations of "Factor V Leiden (G1691A) and MTHFR C677T Double Heterozygote . . . and oral contraceptive use." (LINA 0120.) Dr. Greenberg's report contained a genetic testing report by Yingying Tang, MD, PhD, FACMG, noting that "Heterozygotes for the factor V Leiden mutation have an approximately 4 to 8-fold increased risk of venous thrombosis as compared to individuals without mutation." (LINA 0127.)

Dr. Greenberg also noted that there were contusions all over Nadia's body:

**INJURIES:**
There are three contusions of the back. One measures 1" x 3/4" and is on the midline of the lumbar region. The other two are on the right shoulder area and measure 1" x 1/2" each. There is a contusion of the posterior right thigh measuring 3" x 2". There is a group of three contusions superior to the larger thigh contusion ranging from 1/2" to 1". There are scattered contusions of the right arm and forearm ranging from 1/4" to 1/2".

(LINA 0121.) The contusions Dr. Greenberg discovered on Nadia's body were not mentioned in either the EMS report or the hospital admission records. (LINA 0129-

0132.)  They were, however, discussed in the hospital records from June 26, 2005 and June 30, 2005.  (LINA 0341, 0373.)

Through her employment at Lehman Brothers, Nadia was insured by a group accidental death policy, OK 980053 ("the Policy"), issued by LINA to Trustee of the Group Insurance Trust for Employers in Finance, Insurance and Real Estate Industry, under which Lehman Brothers was a covered affiliate.  The Policy provides benefits to the beneficiary for losses caused by "covered accidents."  "Covered accident" is defined in the Policy as

> A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
> 1. occurs while the Covered Person is insured under this Policy;
> 2. is not contributed to by disease, Sickness, mental or bodily infirmity;
> 3. is not otherwise excluded under the terms of this Policy.

(LINA 0057.)  "Sickness" is defined by the Policy as a "physical or mental illness."  (LINA 0059.)  The Policy also explicitly excludes certain types of losses, including "any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from . . . Sickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof . . . ."  (LINA 0063; LINA 0071.)

### B. History of the Dispute

Nadia's mother, Irina Ulyanenko, was named as the beneficiary of her daughter's policy.  As such, she submitted a claim for accidental death benefits to LINA in September 2005.  Her claim was denied on October 19, 2005.  (LINA 0035-0037).  Plaintiff's appeal was then reviewed, and denied, by Renee Worst, LINA Technical Specialist, Life and Accident Claims Services.  (LINA 0009-0011.) [1]

---

[1] Plaintiff spends a significant portion of her briefs detailing alleged faults in Ms. Worst's training, judgment, application of company policy, and her failure to give Plaintiff's claim a "full and fair review."  (*See, e.g.*, Dkt. No. 74 ("Pl. Prop. Fact & Law") ¶¶ 56-113, 225-234.)  However—as this Court repeatedly noted in the hearing on

Plaintiff filed this action in the Supreme Court of the State of New York, County of New York, on March 2, 2009, against LINA and Metropolitan Life Insurance Company. The case was removed by LINA to this Court on April 7, 2009. (Dkt. No. 1.) On November 18, 2009, this Court, at the parties' behest, dismissed with prejudice the action against Metropolitan Life Insurance Company. (Dkt. No. 20.) In preparation for a bench trial, the parties submitted pretrial memoranda and proposed findings of fact and conclusions of law on February 15, 2012, March 30, 2012, and April 13, 2012. (Dkt. Nos. 73-76.) At the final pre-trial conference, on February 22, 2012, the parties stipulated that trial would be would be decided by the Court "on the papers," meaning without live testimony. (Dkt. No. 79.) However, the Court then held oral argument on November 7, 2012 on several discrete issues. (Dkt. No. 85.) This opinion details the Court's conclusions of fact and law in this matter.

LINA asserts that Nadia's claim did not meet the Policy's definition of "covered accident" because her death stemmed not from an accident, but from a pre-existing condition, that is, her genetic disorder; in addition, LINA contends that Nadia's claim was barred by a policy exclusion for a loss resulting from sickness, disease, bodily or mental infirmity, or the medical or surgical treatment thereof, because Nadia was taking contraceptives for her ovarian cysts, which contributed to her death. (Dkt. No. 76 ("Def.'s Pre-Trial Mem.") at 8-9.) Plaintiff, however, contends that the claim was improperly denied under ERISA. Plaintiff argues that the evidence indicates that Nadia suffered a fall as a result of choking on a peach pit and vomiting, and that this fall and/or her vomiting caused the blood clot that killed her.

---

February 21, 2012—given that this Court is reviewing the claim denial *de novo*, Ms. Worst's behavior is ultimately irrelevant to the disposition of this case.

## II. Discussion

### A. Standard of Review

#### 1. Review of an Administrator's Decision

Because the Policy does not contain language conferring discretion on LINA, the Court's review is *de novo*, *see Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), meaning that "all aspects of [the] administrator's eligibility determination, including facts issues," are reviewed *de novo*. *Lochner v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 (2d Cir. 2004); *see also Troy v. Unum Life Ins. Co.*, No. 03 Civ. 9975 (CSH), 2006 WL 846355, at *7 (Mar. 31, 2006) ("A district court continues to possess the authority to weigh competing physician opinions itself, and to make findings of fact based on its own consideration of the evidence"). While there is a "presumption" that, in their review of an administrator's decision, courts are limited to "the record in front of the claims administrator," additional evidence can be admitted into evidence when "good cause" exists. *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 125 (2d Cir. 2003) (quoting *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66 (2d Cir. 1997); *see also Lochner*, 389 F.3d at 296 (explaining that conflict of interest and a lack of internal review procedures bolster a district court's determination of good cause). On February 21, 2012, this Court decided to admit limited external evidence. (*See* Dkt. No. 77.)

#### 2. Burdens of Proof

As the Second Circuit has made clear, in ERISA cases, "the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies." *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002) (citations omitted). In the case at bar, LINA contends it rightfully rejected the claim both because there

was no coverage and because an exclusion applied.  Thus, Plaintiff carries the burden of showing that Nadia's death is a "covered accident" under the plan.

In assessing whether the ERISA plans cover particular incidents, the Court must "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 1989) (quoting *Todd v. AIG Life Insurance Co.*, 47 F.3d 1448, 1452 n. 1 (5th Cir. 1995). Additionally, any ambiguities in the contract should be read against the insurer. *Id.*

### B. Is Insured's Death a "Covered Accident" Per the Policy Definition?

The preliminary finding the Court must make is whether Nadia's death constituted a "covered accident" under the Policy.  "Covered Accident" is defined in the Policy as a "sudden, unforeseeable, external event that results, directly and independently of all other causes" in an injury that "is not contributed to by disease, Sickness, mental or bodily infirmity."  (LINA 0057.) Thus, in order to show that Nadia's death constituted a "covered accident," Plaintiff must demonstrate, first, that no "unforeseeable, external event" caused the death and, second, that the death was not caused, even in part, by a "mental or bodily infirmity"—in other words, that the accidental cause of death was "independent[] of all other causes." *Accord Noonan v. Hartford Life Ins. Co.*, 07 Civ. 0149, 2009 WL 3126855, at *2 (E.D.N.Y. Sept. 25, 2009) (explaining that, because there was a contributing factor in a death, an insured cannot recover under an accident policy allowing recovery for injuries "resulting directly and *independently of all other causes*.")

In an attempt to meet her burden, Plaintiff points to some evidence that, before her clot, Nadia had "a problem with food, where she vomited twice, and had contusions to her body"— presumably from falling to the ground.  ("Pl. Prop. Fact & Law" at ¶ 186.)  Plaintiff suggests that

Plaintiff then suggests that "one or more of her contusions was a cause of the clot or a precipitating factor in her having a clot." (*Id*. at ¶ 190.)

Plaintiff's conjecture that the contusion caused or was a precipitating factor in the clot is just that—a conjecture, based completely on meager circumstantial evidence. Plaintiff offers absolutely *no* direct evidence that Nadia fell to the ground before suffering from the blood clot. Indeed, Nadia told the emergency medical technicians that she "fe[lt] sick," but said nothing at all about having a fall. (LINA 0131-0132). Nor did the person who admitted Nadia to St. Luke's-Roosevelt Hospital Center appear to think Nadia had experienced a fall.[2]

Plaintiff is correct that the evidence does indicate that Nadia suffered a physical trauma of some sort; the hospital records from several days into Nadia's stay, as well as the autopsy report, mention contusions on Nadia's body. (LINA 0121, 0341, 0373.) However, given the severity of the contusions found by Dr. Greenberg, it seems unlikely that the bruises would have gone unnoted by the emergency medical technicians and intake persons at the hospital. It is possible, as Plaintiff posits, that someone could fall after having felt sick from vomiting, but it seems less plausible that neither the EMS report nor the hospital intake report would fail to mention the fact that she had suffered contusions after a fall. (*See* LINA 0129-0132.) Especially because Nadia suffered from seizures while in the hospital, it does not seem at all unlikely that Nadia might have received those contusions in the hospital, either before or after going into cardiac arrest. This appears all the more probable when one considers that the hospital records, unlike the hospital intake report and the EMS report, mention and describe Nadia's contusions. (LINA 0341, 0373.) Moreover, while it is certainly true that contusions can be caused by a fall,

---

[2] Moreover, Plaintiff's contention that Nadia vomited from either "food poisoning or gagging" is not substantiated by the record. Indeed, all we know is that Nadia "ate a peach" at some point before feeling sick. (LINA 0134.)

7

Dr. Greenberg gives no indication that that this was the case. Thus, this Court finds that Plaintiff has not met her burden in this case.[3]

Therefore, this Court finds that Plaintiff has not met her burden of demonstrating, by a preponderance of the evidence, that Nadia's death was covered under her accidental insurance Policy.

### C. Does Nadia's Genetic Predisposition Constitute an Exclusion?

Even if Plaintiff had met her burden of proving a "covered accident" under the Policy, Defendant argues that coverage is excluded because her genetic mutation constituted a "[s]ickness, disease, bodily or mental infirmity, bacterial or viral infection or medical or surgical treatment thereof." According to Defendant, Nadia's genetic mutation—which made the risk of thrombosis 4 to 8 times the normal risk—is a "disease" or "bodily infirmity" under the Policy exclusion.

The Court is not persuaded that a person's genetic predisposition—unknown to her throughout her life—constitutes a preexisting condition within the Policy's exclusion for "diseases" and "bodily infirmities." Defendant argues that, if a genetic predisposition is not considered a disease, the logical extension would be to consider "other genetically based diseases [as] not being included in the exclusion, including type 2 diabetes." (Def.'s Pre-Trial Mem. at 18) This argument lacks merit. The Court is not questioning that type 2 diabetes is a disease, but rather that, by simply having a gene that makes one more susceptible to diabetes, one has a pre-existing condition. Similarly, the Court views Nadia's genetic disposition not as a disease or

---

[3] Plaintiff also contends that the clot *must* have been caused by an external event, because Nadia had suffered from her genetic mutation since birth and had been taking birth control for years, but no clot had ever occurred. (Pl. Prop. Fact & Law at ¶¶ 183-85). It may well be true by definition that "something" *always* "trigger[s]" or "precipitate[s]" a blood clot, but this circular reasoning is not enough to get Plaintiff to her burden of proving that a "covered accident" occurred. Indeed, Plaintiff has presented no evidence that the "something" that occurred was external, rather than internal, to the Plaintiff.

bodily infirmity, but as a pre-disposition toward disease or infirmity.  The difference is an important one.  Moreover, *Hall v. Metropolitan Life Insurance Co.*, 259 Fed.Appx. 589 (4th Cir. 2007), is distinguishable from the case at bar.  In *Hall*, the Fourth Circuit held that a bee sting allergy constituted a pre-existing condition.  There, however, the defendant insurance company pointed to evidence that allergies are considered diseases by, *inter alia*, the National Institute of Allergy and Infectious Disease.  *Id.* at 595.

Thus, this Court does not find persuasive Defendant's contention that Nadia's genetic predisposition constitutes an exclusion under the Policy.   However, because Plaintiff has not met her burden of proving a covered accident under the Policy, it is not necessary for the Court to decide whether LINA has established that coverage is excluded because of Nadia's genetic predisposition or her use of birth control.

### III.    Conclusion

For the foregoing reasons, this Court finds that Plaintiff has not met her burden of proving that the death of the insured resulted from a covered accident under the Policy, and accordingly, Defendant has no duty to pay Plaintiff on Nadia Ulyanenko's insurance policy.  The Clerk of the Court is directed to terminate this case.

SO ORDERED.

Dated: New York, New York
       November 13, 2012

_____
J. PAUL OETKEN
United States District Judge